## West Chester Capital Advisors Inc. v. Marra

378

C.P. of Chester County, No. 2014-00682

*George C. Zumbano* and *Jeffrey D. Bukowski*, for plaintiff.

*James C. Sargent,* for defendants.

TUNNELL, *J.,* July 11, 2014—Appellants, Bruce L. Marra and West Chester Asset Management, Inc. (hereinafter referred to simply as "Marra"), filed a timely appeal from the decision and orders of this court entered May 15, 2014, which granted preliminary injunctive relief to appellee, West Chester Capital Advisors, Inc. ("WCCA"), and found appellants in contempt of the court's January 31, 2014 injunctive order. The orders followed evidentiary hearings held April 1, 2, 8, 9 and 23 and May 1, 2014 and briefing by the parties thereafter.

The court entered an order directing appellants to file a concise statement of the errors complained of on appeal. They did so.

## DISCUSSION

Appellants assert twelve alleged errors on appeal. More than half of the errors (¶¶ 1,3, 4, 7, 9, 11 and 10) challenge the factual determinations made by the court after it heard extensive testimony over the course of multiple hearing days. The remainder of the errors complained of (¶¶ 2, 5, 6, 8 and 12) challenge the legal conclusions which supported the court's decision to enforce the restrictive covenant to which Mr. Marra agreed in his employment agreement with appellee.

The court rendered a decision of 26 pages containing detailed findings of fact, conclusions of law and a discussion of authorities, dated May 14, 2014, upon which the order for preliminary injunction rests. After review, the court believes that its prior decision fully sets forth the court's reasoning for granting appellee's request for injunctive relief and addresses the majority of errors asserted in the concise statement. The court, nonetheless, will address

further some of the points raised in appellants' concise statement of errors as they relate to the (1) civil contempt order and (2) preliminary injunction order.

Before doing so, it is important to mention certain unique issues present in this appeal.

The concise statement of errors complained of filed by Marra groups the errors under the headings of "JNOV" and "new trial." Judgment Notwithstanding the Verdict (JNOV) is warranted only in two situations: (1) the movant is entitled to judgment as a matter of law, or (2) the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Walker v. Drexel Univ.*, 2009 Pa. Super. 80, 971 A.2d 521 (2009). On the first ground, a court reviews the record and concludes that even with all the factual inferences decided adverse to the movant, the law nonetheless requires a verdict in the movant's favor. On the second basis, a court reviews the evidentiary record and concludes the evidence is such that a verdict for the movant is beyond per adventure. *Betz v. Erie Ins. Ex.*, 2008 Pa. Super. 21, 957 A.2d 1244 (2008). If there is any basis upon which the jury could have properly made its award, a denial of a motion for JNOV must be affirmed. *Sewak v. Lockhart*, 699 A.2d 755 (Pa. Super. 1997).

Inasmuch as this appeal lies from the entry of a preliminary injunction, there is no "verdict", nor any similar final order. Thus, any argument for the failure to enter JNOV makes no sense. In order to preserve the right to request a JNOV post-trial, a litigant must first request a binding charge to the jury or move for a directed verdict at trial. *See* Pa.R.C.P. 227.1(b)(1); *Hayes v. Donohue Designer Kitchen, Inc.*, 2003 Pa. Super. 84, 818 A.2d

1287, 1291, n. 4 (Pa. Super. 2003). Appellants did not do so.

Another problem with this appeal is that although Marra requested that a transcript be prepared, he has failed to pay for it so that the record is incomplete and cannot be reviewed consistent with the foregoing standards. The court is thus mightily hampered in furnishing a detailed opinion with citations to a certified transcript. *Cf.* Pa.R.J.A. 5000.11(b).

Nevertheless, it will do its best to address the errors raised by Marra.

A. Appellants' Challenges to the Civil Contempt Order

Appellate review of a finding of contempt is limited to deciding whether the trial court abused its discretion. *McMahon v. McMahon*, 706 A.2d 350, 356 (Pa. Super. 1998). *See also Sinaiko v. Sinaiko*, 445 Pa. Super. 56, 63, 664 A.2d 1005, 1009 (1995) (review of finding of civil contempt limited to determining whether trial court committed "clear" abuse of discretion). Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. *Miller v. Sacred Heart Hosp.*, 753 A.2d 829, 832 (Pa. Super. 2000). Great reliance is placed on the sound discretion of the trial judge when reviewing an order of contempt. *Sinaiko*, 445 Pa. Super. 56, 63, 664 A.2d at 1009.

1. The court properly concluded that Marra's so-called "volunteers" were acting under his control and at his direction.

### a. Concise Statement — Error 1

In arguing that it was error for the court to hold him in indirect civil contempt, Marra asserts that "as a matter of law" neither he nor his company are responsible for the actions of non-parties "who were not employed" by either Marra or WCAM, and who acted on their own, independently, "as volunteers."

The evidence revealed, and the court found, that two long-time former employees, a Mrs. Moffett and a Ms. Founds, were in fact hard at work for Marra in no way distinguishable from what they used to do. In fact, Mr. Marra could not operate an investment advisory business at all without them because, as an older gentleman, he did not do his own typing, did not send emails, and could not operate the portfolio management software necessary to record trades, prepare invoices and perform other tasks. In short, he was helpless without them.

As findings of fact, the court found that Ms. Founds continued to operate the portfolio management software which she had copied onto her personal laptop, and performed services for Marra. (Finding of fact no. 63). Ms. Founds worked approximately 20-30 hours per week for Marra and his new company, three days a week from her home in Chester County, and two days in the Philadelphia office. (Finding of fact no. 62). Ms. Founds also prepared a significant number of the client advisory contracts for Marra, and other client account forms. Marra could not do so. Insofar as she did so, she necessarily used confidential information that belonged to WCCA, (Finding of fact no. 65), as will be further discussed.

Marra asserts that because these individuals worked only part-time, and worked without pay, they were necessarily "volunteers."

The court saw it differently.

Agency is the relationship that results from (1) the manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) an understanding between the parties that the principal is to be in control of the undertaking. *Basile v. H&R Block, Inc.*, 563 Pa. 359, 761 A.2d 1115 (2000). An agent may be either be a servant/employee, or an independent contractor. A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right of control by the master. *Smalich v. Westfall*, 440 Pa. 409, 269 A.2d 476 (1970). An agent who furthers his employees' interests, activities or affairs in general is his servant in the sense that liability follows the servant's wrongdoing. *Manufacturer's Cas. Ins. Co. v. Goodville Mut. Cas. Co.*, 394 Pa. 364, 366, 147 A.2d 161, 163 (1959). Ms. Founds did testify that she was not currently being paid. In any event, it is not required for a servant or an employee to be paid in order to occupy either status. *Biedenbach v. Teague*, 194 Pa. Super. 295 (1960), *McMahen v. White*, 30 Pa. Super. 169 1905)(where person undertakes voluntarily to perform services for another, who assents thereto, he or she stands in relation of servant to latter); Restatement (Second) of Agency § 225 (1958) ("One volunteering services without an agreement for or expectation of reward may be a servant of the one accepting such services.")

Under the circumstances of this case, the overwhelming evidence indicates that these two individuals were at all times acting at the specific request and under the control of Marra in the furtherance of his interests, activities and business and, consequently, Marra would be liable for their torts. This is essentially 6.40 (Civ) of the Pennsylvania

Suggested Standard Civil Jury Instructions. The same logic compels the conclusion that Marra can be and was properly held in indirect civil contempt for their activities by reason of that same direction and control.

2. The court properly concluded that Marra was operating an investment advisory business in Chester County.

a. Concise Statement — Errors 3 and 10

Several of the assigned errors suggested that the court "disregarded the unrefuted evidence." In fact, in error 3 and 10, the "unrefuted evidence" was that Marra and his company provided investment advisory services only from their new office in Philadelphia County.

Even if this evidence was unrefuted, and it was not, no one who takes the witness stand is entitled to be believed. Credibility is more than just truthfulness. Even uncontradicted testimony need not be accepted by the trier of fact as either true or accurate. *Taliaferro v. Darby Twp. Zon. Hearing Bd.*, 873 A.2d 807 (Pa. Cmwlth. 2005). As the judge of believability and of the facts in the case, the court was entitled to give Marra's evidence whatever weight the court determined it should receive. In this respect, the court can believe all, or part, or none of any witness' testimony.

The court's credulity was strained to the breaking point when, on February 10, 2014, the very day plaintiff's investigator went into Marra's office at 106 South Church Street, West Chester, Marra was discovered to be conducting his investment advisory business. One of "his" elderly clients, and they were almost all elderly, a Mrs. Parry, was signing trade authorization forms, duly notarized by Ms. Moffett. (Finding of fact no. 46). As the

court wrote in its footnote to the contempt order "the court does not give credence to Marra's testimony that this was a singular occurrence."

Marra also argues that the use of old software loaded onto a computer by Mrs. Founds could not be a misappropriation of any trade secret by anyone. *See also* concise statement — error 11. Marra appears to argue that the software is of such vintage that it was not useful, or that the information on the laptop in question could not be a property right of the plaintiff today. The credible evidence belies these arguments. Even if the software predated the acquisition of Marra's stock, thus arguably once belonging to Marra's former company, the purchase of 100% of his shares for $2,769,966 necessarily included the acquisition of any rights to this portfolio management software. The software was later copied onto Ms. Founds' personal laptop so that she could continue to perform the services aforementioned. (Finding of fact no. 63). The software in question was capable of taking client data and finances and recording trades, updating client portfolios, preparing invoices, and performing a number of related tasks for client accounts which are absolutely important to operating an investment advisory business. (Finding of fact no. 64).

Under Pennsylvania law, an employer has a legitimate interest in the protection of its trade secrets and other confidential information. *See Hess*, 570 Pa. at 163, 808 A.2d at 921 (citing *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 631, 136 A.2d 838, 846 (1957)); *Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Property and Casualty Ins. Agency*, 693 A.2d 1330, 1337 (Pa. Super. 1997) (affirming non-compete covenant enforceable where independent insurance agency had legitimate protectable interests in confidential information and trade secret data);

*see also Quaker Chem.*, 509 F. Supp. 2d at 479 (E.D. Pa. 2007) (holding employer entitled to specific performance of the non-competition covenant because former employee possessed extensive knowledge of employer's confidential information and thus had a "very real opportunity to harm Quaker's legitimate business interest" by working for a competitor); *Nat'l. Bus. Servs., Inc. v. Wright.* 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998) (holding defendant's proposed work for plaintiff's competitor "would violate the noncompete agreement" because, among other reasons, "[i]t is virtually inconceivable that [defendant] would be able to avoid utilizing the confidential information she learned at [plaintiff] corporation and exploiting [plaintiff's] customer goodwill). The court found that the use of the software described, and as important, the use and disclosure to appellant West Chester Asset Management of the information maintained by the software, still belongs to WCCA, the plaintiff appellee. (Finding of fact no. 65). A client's name, address and financial information is either confidential, or it is not. The court was able to judge the credibility and demeanor of five or six different clients who testified at trial, and has no doubt that they would consider their information to be certainly private, confidential and protectable as a trade secret for all intents and purposes. As the court has previously written, when one solicits customers one presumably uses confidential information to garner their names and addresses as well as other financial information regarding them. *Bell Fuel Corp. v. Cattolico*, 375 Pa. Super. 238, 257-58, 544 A.2d 450, 460 (Pa. Super. 1988). The court drew that inference here.

In addition, there was much credible evidence that the Philadelphia County office conducted virtually no investment advisory business, and that the mail and just

about everything else was redirected to Chester County, as the court set out in its decision.

b. Concise Statement — Error 4

In this error, Marra attempts to exculpate himself from violations of the court's order of January 31, 2014 by asserting (1) that he acted on advice of counsel — which in the court's estimation is no defense, (2) he was entitled to retain counsel in Chester County to defend himself — which is not the point, and that (3) "counsel's purpose, as disclosed on the record," was to collect such contracts and disclose them to opposing counsel. The point is Marra was ordered not to conduct any such business within Chester County by the court. *See Harley Davidson, Inc. v. William Morris*, 19 F.3d 142, 148-49 (3d. Cir. 1994)(noting that willfulness is not a necessary element of civil contempt) (citing *Waste Conversion, Inc. v. Rollins Environmental Services (NJ), Inc.*, 893 F.2d 605, 609 (3d Cir.1990)(citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949)); *see also See Gunther v. Bolus*, 2004 Pa. Super 8, 853 A.2d 1013 (2004) (sustaining court's finding that willful violation of court order occurred despite testimony by violator that he tried to contact counsel to determine if order was stayed pending appeal). Counsel did state his "purpose," but this was not evidence that the court was bound to consider or believe. His counsel cannot excuse Marra. The same counsel had also scripted Marra's talking points and correspondence. Forwarding unopened mail to counsel's office was no prophylactic.

c. Concise Statement — Error 12

Appellants contend that the court erred in denying their oral motion to exclude the testimony of witness, Karen Carter, during the contempt proceedings. Appellee called

Ms. Carter, a paralegal in the office of plaintiff's counsel, to testify about observations she made of the physical aspects of the business located at 106 South Church Street during a visit on February 10, 2014, days after the court's initial injunction order, dated January 31, 2014. Appellants' objected to the testimony on several hearsay grounds and argued that Ms. Carter's presence in the office amounted to a violation of the Rule of Professional Conduct 4.2. After consideration of the evidence, and the arguments presented at the time of appellants' oral motion and briefed in the parties' memoranda of law, the court concluded that exclusion of the testimony was not required.

Although counsel can be disqualified for violations of the Rules of Professional Conduct, misconduct, or in this case alleged misconduct, may not be used as a basis for altering the rules of law, including evidentiary rules, presumptions and burdens of proof, which would otherwise apply to a case. *In re Estate of Pedrick*, 505 Pa. 530, 542-43, 484 A.2d 215, 221-22 (1984). Appellants acknowledged as much when in arguing the motion to exclude Ms. Carter's testimony they sought to preclude the testimony on evidentiary grounds not pursued in this appeal. The requested relief for the alleged violation of the Rule of Professional Conduct 4.2 was referral of the conduct by the court to the disciplinary board. In their memorandum of law on this issue, appellants stated the following:

> Defendants respectfully submit...that the issue as to the propriety of counsel's actions should be referred by the court to the disciplinary board...

(Def.'s memo. to preclude oral testimony, at p. 3.)

The court concluded after hearing the limited testimony

of Ms. Carter that her conduct did not require further action by the court. As important, the court had ample testimony from other witnesses, including but not limited to Marra himself and his agent, Ms. Founds, with which to conclude that a violation of its prior order had occurred.

B. Appellants' Challenges to the Preliminary Injunction Order

Appellate review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential." *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount Inc.*, 573 Pa. 637, 828 A.2d 995, 1000 (2003). In reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below." *Id.* Appellate courts on appeal are

> bound by the chancellor's findings of fact, particularly if approved by the court *en banc*, to the same extent as we would be bound by the factual determinations of a jury. The test in either case is whether the findings are adequately supported by the record. The chancellor's findings are entitled to particular weight in a case in which the credibility of the witnesses must be carefully evaluated, because he has had the opportunity to hear them and to observe their demeanor on the stand. *Charles v. Henry*, 460 Pa. 673, 334 A.2d 289 (1975).

*Stauffer v. Stauffer*, 465 Pa. 558, 567, 351 A.2d 236, 240 (1976); *accord Weir v. Estate of Ciao*, 521 Pa. 491, 556 A.2d 819 (1989) (at bench trial, it is trial court's duty to judge credibility and weigh testimony and its findings will not be disturbed absent error of law or abuse of discretion); *Hostetter v. Hoover*, 378 Pa. Super. 1, 6, 547 A.2d 1247, 1250 (1988) (appellate courts are constrained by narrow

standard of review in equity matters and are bound by trial court's determination pertaining to credibility of witnesses and weight to be accorded evidence).

1. The court construed the restrictive covenant in accordance with Pennsylvania law.

a. Concise Statement — Error 2

Appellants contend that the court erred when it found that the parties' dealings at the conclusion of the two year term of the initial employment agreement effectuated a renewal of the employment agreement and the restrictive covenant therein. The court fully addressed this issue and the case law supporting its conclusions at pp. 17-20 of its decision, but a few additional points are worth noting.

First, appellee did not shy away from the 2011 employment agreement as suggested by appellants. Instead, WCCA consistently argued that Marra's employment with plaintiffs, both as an employee and a corporate director, continued uninterrupted until the date of Marra's voluntary resignation under the same compensation arrangement, with the exception of certain stock options that were the subject of discussion between the parties. During his continued employment, Marra received the same salary and benefits as he did under the first employment agreement. The parties continued negotiations on limited aspects of his compensation.

Second, appellants' attempt to distinguish *DeMuth v. Miller*, 438 Pa. Super. 437, 652 A.2d 891 (Pa. Super. 1995) falls short. Marra contends his facts are different from those in *DeMuth* because there "the facts established that the parties had repeatedly renewed their contract." (Def.'s mot. for reconsideration, at ¶30). As discussed, the facts in this case demonstrate the same.

Like in DeMuth where the parties' negotiations over the defendant's bonus continued after the expiration of the first agreement, here the parties continued to discuss additional compensation terms (*e.g.* stock options) during Mr. Marra's employment. This fact does not negate the court's finding that a renewal occurred.

Finally, it did not go without notice to the court, sitting in equity, that Marra conveniently timed the end of these discussions and his resignation for just weeks before the end of the restrictive period imposed by the first employment agreement. In essence, Marra continued his employment (and directorship) with appellee pursuant to the same compensation terms, while discussing additional aspects of his compensation plan, in an effort to "run out" the time on the restrictive covenant to which he agreed and was bound. The court properly concluded that appellants should not have been permitted to deprive appellee of the benefit of the bargain reached by the parties. *See Erkess v. Eisenthal*, 354 Pa. 161, 47 A.2d 154 (1946); *Levin v. Pittsburgh United Corp.*, 330 Pa. 457, 199 A. 332 (1938); *Bloshinski et al. v. Falaz*, 168 Pa. Super. 565, 79 A.2d 798 (1951)(extending time for performance of contract although time set out in agreement had expired, in order to avoid harm that would have befallen the moving party).

b. Concise Statement — Error 5

Appellants contend that the court failed to (1) construe the restrictive covenant narrowly and (2) "acknowledge" that restrictive covenants are restraints of trade. The court is well aware of the law in this Commonwealth with regard to restrictive covenants and the parties reiterated those principles for the court in their various briefs and proposed findings of facts and conclusions of law. The court set

forth the requirements for injunctive relief in its decision at pp. 23-24 and contrary to appellants' suggestions, was not required to "acknowledge" that restrictive covenants are restraints of trade.

Appellants' claim that the court erred in finding that Marra violated his restrictive covenant and the court's January 31, 2014 order by contacting WCCA clients is likewise without merit. First, the court rejects appellants' assertions that Marra's actions were simply part of his effort to contact clients in order to "inform" them of his departure. Having judged the witnesses' credibility and their testimony, the court found that Marra's conduct did not amount to "informing" clients, but "soliciting" them in violation of the restrictive covenant.

Second, appellants improperly rely upon *PTSI, Inc. v. Hadley*, 2013 Pa. Super. 130, 71 A.3d 304 (2013) to support their argument that Marra had the right to contact customers to "inform" them of his departure. In *Hadley*, the claim was one for breach of loyalty and fiduciary duty, not one based upon a contractual restriction. The *Hadley* court acknowledged that although a party may have the right to begin a new business and compete — that right can properly be limited when there is an express contract and/or elements of fraud or trade secrecy exists. *Id.* at 312.

c. Concise Statement — Error 6

Marra also complains in error 6 that the court "erred in failing to refer the matter to arbitration consistent with the arbitration clause...for findings of fact as to the meaning of key terminology." The arbitration clause set forth no such requirement and appellants did not make such a request of the court at any time prior to their motion for reconsideration. The record will reveal that

Marra moved the court to refer the matter to arbitration consistent with the arbitration clause in the employment agreement, which motion the court granted. However, both parties acknowledged that specifically excepted from that arbitration clause were injunctive matters, and that was what the court was hearing. In so doing, the court necessarily had to interpret and understand the agreements between the parties, or it could not have performed its job. It could hardly be error for the court to do so. The court did note in its order of May 15, 2014 that the arbitrators were free to come to any different interpretations in findings of fact of the matters properly before them.

d. Concise Statement — Errors 7 and 9

In these errors, Marra contends that the court failed to give proper weight to facts/conclusions that they deemed important to the case — all of which center upon Marra's opinions about how WCCA ran its business and whether or not it was doing a good job. These assertions are irrelevant to the questions that were before the court: was Marra subject to a restrictive covenant and if so, did he violate that covenant. Marra cannot excuse his conduct by disparaging the manner in which appellee managed its business.

For example, during the hearings, Marra made much ado about the Cannon Report, a market study which Ameriserve had commissioned. It contained a caveat of sorts to Ameriserve that the clientele might well consider its allegiance to be with Mr. Marra and follow him. It was Ameriserve's prerogative to proceed with the acquisition of Marra's interest anyway. The court inferred that it was for that very reason that Ameriserve insisted that Marra sign the restrictive covenants in this case. The fact that

the Cannon Report exists in no way excuses Marra from violating those covenants.

One of the biggest ironies in this case is that Marra went to a good deal of trouble that in all likelihood would have been unnecessary. The court has no doubt that some number of the plaintiff's clients, and they were then the plaintiff's clients, would have found their way to Mr. Marra in any event. His exertions of November, December and January in soliciting some of them were needless. There was no exception in the restrictive covenant for old friends. Marra argued, but the evidence did not show, "that most of the clients who left...initiated the contact with Marra themselves." Some did, but many did not, and some who came to court to testify were shown to have been prompted by Marra.

Mr. Kraywick was under no contractual prohibition from soliciting, nor from trying to keep the business his company had acquired, and he had every right to contact the people that he did to that end. There was no reason why he could not advise his clientele that Marra was obliged to follow a restrictive covenant.

e. Concise Statement — Error 8

In this error, appellants attempt to avoid responsibility for their actions by claiming that (1) as a "lay person" Mr. Marra could not have understood that his actions constituted solicitation and (2) the court erred by choosing to cite a definition of the term "solicit" that appellants claim is "arcane." Their arguments fail.

First, appellants' insistence the court's use of the most "modern" definition of the term "solicit" ignores a material fact in this case. The contractual language did not simply

prohibit solicitation. The contractual prohibition covered actions to "solicit...or attempt to divert." Mr. Marra did both.

Second, although the court included in its discussion one definition of the term "solicit" (which Marra acknowledges can be defined in similar, yet not identical ways by arguing for the use of two other definitions of "solicit"), the court did not rely solely on that citation. Throughout its decision, and in this part of its discussion, the court cited to and relied upon case law involving similar facts. The definitions offered by appellants are consistent with that offered by the court and had they been used would not have changed the court's findings.

Finally, to suggest now, as he did during the proceedings, that Mr. Marra did not know what the term "solicit" meant is totally unconvincing. Mr. Marra is not a "lay" person as argued by appellants. He is a licensed member of the financial services industry, subject to its rules and regulations and those of the firms with which he associates. He has been so for years. As a member of a regulated industry, it is Mr. Marra's job to know what he can and cannot do when servicing and handling clients. If Mr. Marra wished only to "inform" his clients that he was leaving and to "remind" them of their right to choose a broker, he could have asked appellee (a) to send a letter or (b) to review and approve his letter to ensure he complied with his restrictive covenant. He did not do either because the evidence showed that he intended to improperly solicit clients.

"To solicit" in the financial services world (and to the advisors and brokers who work in it) is neither obtuse nor a word of art. There is in fact no need to resort to a dictionary to discover its meaning.